AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original  ☐ Dupl

FILED
CLERK, U.S. DISTRICT COURT

5/8/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

5/8/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

# UNITED STATES DISTRICT COURT

## for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>WILLIAM GREGORY GARCIA, and<br>GERMAN HERNANDEZ VELASCO,<br><br>Defendants | Case No.  2:23-mj-02285-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about April 26, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

> *Code Section*
> 18 USC § 922(g)(1)
>
> *Offense Description*
> Felon in Possession of Firearms and Ammunition

This criminal complaint is based on these facts:

> *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Alex Saldana*
_____
*Complainant's signature*

Alex Saldana, ATF Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        5/8/23
_____
*Judge's signature*

City and state:  Los Angeles, California          Hon. Charles Eick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Elizabeth Douglas, x5728

**AFFIDAVIT**

I, Alex Saldana, being duly sworn, declare and state as follows:

**I.   PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant against William Gregory GARCIA ("GARCIA") and German HERNANDEZ VELASCO ("HERNANDEZ") for 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Los Angeles County Sheriff's Department, in Whittier, California, as described more fully in Attachment A:

        a.    A rose gold Apple iPhone ("SUBJECT DEVICE 1");

        b.    A black LG smartphone with a cracked screen ("SUBJECT DEVICE 2");

        c.    A black Nokia smartphone with a cracked screen ("SUBJECT DEVICE 3");

        d.    A black Motorola smartphone in a black case ("SUBJECT DEVICE 4");

        e.    A black HP external hard drive, model number SSDS700, serial number HBSA3243200655 ("SUBJECT DEVICE 5");

        f.    A blue/green iPhone with a Jeep sticker affixed to it ("SUBJECT DEVICE 6");

        g.    A Black ZTE phone ("SUBJECT DEVICE 7");

        h.    A black Kyocera flip-style phone, model S2150 Kona ("SUBJECT DEVICE 8");

i.   A blue Motorola phone in a blue/gray case with a cracked screen, model XT2043-4, IMEI number 355539111065689 ("SUBJECT DEVICE 9");

j.   A black Samsung phone, IMEI number 356425113244122 ("SUBJECT DEVICE 10");

k.   A black and rose gold Amgoo cellular phone, model AM450 ("SUBJECT DEVICE 11");

l.   A black Motorola phone with a cracked screen, ("SUBJECT DEVICE 12");

m.   A black and brown Huawei cellular phone with a cracked screen ("SUBJECT DEVICE 13"); and

n.   A black Samsung Galaxy S7 Edge phone, IMEI 357090075948869, ("SUBJECT DEVICE 14").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), 18 U.S.C. § 922(g) (prohibited person in possession of a firearm), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts and weights are approximate, and all dates and times are on or about those indicated.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Deputy with the Los Angeles County Sherriff's Department ("LASD"), where I have been employed for over 15 years.  Since the fall of 2019, I have also been designated as a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  At the LASD Academy, I received basic narcotics training regarding paraphernalia, packaging, usage, sales, concealment, and transportation of various narcotics, as well as criminal street gangs and subcultures.  I have also attended classes and seminars related to narcotics, organized crime, and gangs.

6.    Upon completion of the LASD Academy, I worked at the Men's Central Jail for approximately five years.  There, I interviewed hundreds of inmates, including both active and inactive gang members and members of organized crime syndicates, regarding drug usage, addiction, street level sales, and the effects of drugs along with.  I also worked for Custody Investigative Services for three years, where I gathered intelligence relating to crimes and criminal organization groups operating in Los Angeles County and the surrounding counties.

During that time, I interviewed hundreds of inmates regarding gangs and narcotics distribution.  I worked as a patrol officer at Compton Sherriff's Station for approximately three years.  During that time, I participated in gang and drug-trafficking investigations, and arrested numerous suspects involving possession, possession for sales, and under the influence of various types of drugs and controlled substances.

7.    During my tenure as a LASD Deputy and ATF TFO, I have assisted in the execution of numerous search warrants related to drug-trafficking, criminal street gangs, organized crime, and firearm-related offenses.

8.    I have testified in state court as an expert for narcotics and drug trafficking organizations.  I have also taught classes in Mexico and Israel on the topic of current trends and identification of drug-trafficking organizations and the illicit products those organizations sell.  Within the United States, I have taught, and continue to teach, for the Federal Bureau of Investigations, the Drug Enforcement Administration, ATF, the Secret Service, local and state agencies, California Department of Corrections, California Narcotics Officers Association, California Gang Investigators Association, California Gang Task Force, and the National Criminal Enforcement Association.

9.    As an ATF TFO, I have participated in investigations related to the possession of illegal firearms by prohibited persons.  Through my training and experience, I am familiar with the ways in which prohibited persons possess and traffic illegal

4

firearms, including the use of vehicles to meet with accomplices and to collect, transport, and distribute illegal firearms and the use of digital devices to coordinate such activities.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.  On April 26, 2023, the Los Angeles Sherriff Department ("LASD") was searching for a victim in a suspected kidnapping that had occurred the day before.  Video of the suspected kidnapping shows a man use what appears to be a black handgun to strike a woman across the face and force her into a car.  LASD Detectives later identified GARCIA as the suspected kidnapper and surveilled his residence.  There, they observed GARCIA and HERNANDEZ loading a van with numerous items, including ammunition cannisters, they had brought out from the residence.

11.  Pursuant to a state search warrant, LASD searched both the van and GARCIA's residence.  In the van, LASD found 17 firearms, hundreds of rounds of ammunition, approximately 38.01 kilograms of suspected methamphetamine, approximately 9.87 kilograms of suspected cocaine, approximately 921 grams of suspected fentanyl, and distribution quantities of various other drugs including suspected heroin, MDMA, Xanax, and marijuana. LASD also recovered SUBJECT DEVICES 2-5 from the van.

12.  In GARCIA's residence, LASD found two firearms, multiple rounds of ammunition, a suspected firearms silencer, numerous firearm magazines, approximately 944 grams of suspected methamphetamine, approximately 328 grams of suspected cocaine, approximately 148 grams of suspected fentanyl, and approximately 15.72 kilograms of marijuana, and SUBJECT DEVICES 6-14.

13.   Two of the 19 total firearms seized have been analyzed and confirmed to have been manufactured outside of the state of California.  Both GARCIA and HERNADNEZ have previously been convicted of a felony crime punishable by more than one year in prison and consequently are prohibited from possessing firearms and ammunition.

14.   While surveilling GARCIA's residence, LASD Detectives also observed GARCIA place a bag of items inside the passenger compartment of a pickup truck.  The vehicle was subsequently searched by LASD Deputies following a traffic stop.  Inside, law enforcement recovered a brick of suspected cocaine and SUBJECT DEVICE 1.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

15.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    LASD Responds to a Report of a Kidnapping**

16.   Based on my conversations with LASD Detectives Duff and Balderrama, my review of law enforcement reports, and my review of video surveillance, I am aware of the following:

a.    On April 25, 2023, LASD Deputy Jacinto and Detectives Duff and Balderrama responded to a report of a kidnapping on Courts Avenue in Commerce, California.

b.    Deputy Jacinto interviewed C.O. who stated that she had been inside her house when she looked outside her window and saw a man drive up, get out of the car, grab a woman, and hit her in the head.  The man then pushed the woman inside the

car.  C.O. said she had yelled out to the man, who responded
with obscenities and a vulgar gesture, and then the man drove
away.

       c.   C.O. provided Detectives Duff and Balderrama
video surveillance of the incident she had observed.  This video
does not have audio.  The video shows a woman -- later
identified as Z.L. -- walking along the sidewalk.  She is
talking on her phone and appears to be trying to hide from
someone.  Z.L. briefly walks onto the driveway of a residence.
Then a silver, four-door Kia ("Silver Kia") appears on the video
surveillance and turns into the same driveway.

       d.   The video surveillance shows the driver of the
car -- later identified as GARCIA -- step out of the vehicle
holding what appears to be a black pistol in his right hand.
Z.L. begins walking toward the passenger side of the Silver Kia
and reaches towards the passenger-side door, touching the door
handle.  GARCIA then pistol whips Z.L. in the face and forces
her into the front passenger seat of the Silver Kia.  GARCIA
then drives the Silver Kia away.

       e.   Deputy Jacinto also spoke to D.V. who said he had
video surveillance of the incident as well, and D.V. provided
this video surveillance to Detective Duff.

       f.   Th video surveillance obtained from D.V. does
have audio.  The video shows Z.L. walking along the sidewalk and
then walking onto the driveway of a residence.  Then the Silver
Kia appears on the video surveillance at fast speed and rapidly
decelerates, partially turning into the driveway where Z.L is

standing.  Z.L. then can be heard repeatedly saying "I'll get in the car" and walks toward the Silver Kia.  GARCIA gets out of the car and hits Z.L. in the head; there is an audible sound when he makes contact.  GARCIA then forces Z.L. into the front passenger seat of the Silver Kia and drives the car away at fast speed.

**B.   LASD Identifies GARCIA**

17.  Based on my conversations with Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

a.   Because neither Z.L. nor GARCIA had yet been identified, LASD put out a public bulletin in an attempt to identify and locate the two individuals in the video and the Silver Kia.

b.   On April 26, 2023, Los Angeles Police Department Officer Vargas sent Detective Duff an anonymous tip that Officer Vargas had received in response to the public bulletin.  The anonymous tip stated that the suspected kidnapper may reside at 5031 Kinsie Street, Commerce, CA 90040 (the "Kinsie Residence") and the license plate of the Silver Kia was 9BES863.

c.   Based on the information provided in the anonymous tip, Detective Duff reviewed California Department of Motor Vehicle ("DMV") records for license plate 9BES863.  Those records indicated that the Silver Kia was registered to GARCIA at the Kinsie Residence.  Further, California DMV records indicated that GARCIA's residence was the Kinsie Residence.

d.    Using law enforcement databases, Detective Duff found two recent booking photographs for GARCIA.  Detective Duff compared those booking photographs to the video surveillance. The suspected kidnapper in the video surveillance had a similar physical appearance to the photographs of GARCIA, including two tattoos of black handprints on the front of each of GARCIA's shoulders.

**C.    Surveillance of the Kinsie Residence**

18.    Based on my conversations with Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

a.    After Detective Duff identified GARCIA as the suspected kidnapper, LASD Detectives from the Major Crimes Bureau and Fugitive Taskforce went to the Kinsie Residence to conduct covert surveillance.  At that time, Z.L. had not yet been found.

b.    LASD Detective Lee saw the Silver Kia parked on the street outside the Kinsie Residence, which was comprised of a house in the front of the property and a structure in the rear (later determined to be a garage converted into living quarters).

c.    At approximately 12:00 pm, Detective Lee saw a silver Nissan Quest van, California license plate 7DLA774, (the "Nissan Van") driven by a man -- later identified as HERNADNEZ -- park alongside the street in front of the Kinsie Residence. HERNANDEZ quickly got out of the Nissan Van and went through a

black side gate on the side of the front house and towards the rear of the Kinsie Residence.

      d.   Moments later, Detective Lee saw GARCIA and HERNANDEZ walk from the rear of the Kinsie Residence.  GARCIA got into the driver's seat of a gold Infiniti that was parked in the driveway, drove it out of the driveway, and parked it along the street.  HERNANDEZ then got into the Nissan Van and pulled it into the driveway of the Kinsie Residence.  Both GARCIA and HERNANDEZ then went back to the rear of the Kinsie Residence and out of Detective Lee's view.

      e.   After a few minutes, Detective Lee saw GARCIA and HERNANDEZ walk back towards the Nissan Van carrying large bags and boxes.  GARCIA and HERNANDEZ loaded these items into the Nissan Van.  The two then made multiple additional trips from the rear of the Kinsie Residence to the Nissan Van carrying bags of various sizes (including black plastic trash bags), boxes (including a Cheez-It box), what appeared to be ammunition cannisters, and dark-colored clothing or blankets.  Detective Lee saw GARCIA and HERNANDEZ load these items into the Nissan Van.

      f.   After loading the Nissan Van, GARCIA and HERNANDEZ walked back towards the rear of the Kinsie Residence and out of Detective Lee's view.

      g.   At approximately 1:45 p.m., Detective Lee saw a charcoal Jeep Gladiator (the "Charcoal Jeep") driven by an individual later identified as T.L.H. stop in front of the Kinsie Residence.  GARCIA then placed a bag of items inside the

passenger compartment of the Charcoal Jeep.  T.L.H. then drove off in the Charcoal Jeep.

h.   Subsequently, LASD Deputies Magana and Moran conducted a traffic stop of the Charcoal Jeep.  They searched the Charcoal Jeep and found a brick of suspected cocaine in a bag that was similar in appearance to the bag LASD Detectives had seen GARCIA place inside the Charcoal Jeep.  LASD Detectives also found SUBJECT DEVICE 1 in the front passenger seat.

i.   At approximately 2:05 p.m., Detective Lee saw a white Audi sedan (the "White Audi") driven by an individual later identified as A.B. stop in front of the Kinsie Residence. GARCIA approached the White Audi on the passenger side.  GARCIA leaned into the inside of the car and appeared to be speaking with A.B.  A.B. then drove the White Audi a short way down the road and parked.  A.B. got out of the White Audi and walked back towards the Kinsie Residence carrying a black backpack.

**D.   Search of Nissan Van Reveals 17 Guns, Hundreds of Rounds of Ammunition, Suspected Drugs, and SUBJECT DEVICES 2-5**

19.   Based on my conversation with Detectives Duff, Balderrama, and Judge, my review of law enforcement reports, and my review of the state search warrant described below, I am aware of the following:

a.   While LASD Detectives were surveilling the Kinsie Residence, LASD Detective Duff obtained a search warrant from the Honorable Margaret M. Bernal, Los Angeles Superior Court, Search Warrant No. NW23S00310, for, among other things, the Kinsie Residence and the Nissan Van.  The Honorable Bernal also

issued a state arrest warrant for GARCIA for kidnapping, in violation of California Penal Code Section 207(a).

b.   At approximately 2:05 p.m., shortly after GARCIA appeared to speak with A.B. in the White Audi, LASD Detectives saw GARCIA get into the driver's seat of the Nissan Van.  At that time, pursuant to the state arrest warrant, LASD Detectives arrested GARCIA.  LASD Detectives Judge, Villegas, and Bohnert then searched the Nissan Van pursuant to the state search warrant.

c.   In the Nissan Van, LASD Detectives found 17 firearms, some of which were found in a dark blue sleeping bag and a Cheez-It box that were similar in appearance to items Detective Lee saw GARCIA and HERNANDEZ load into the Nissan Van, and hundreds of rounds of ammunition in the Nissan Van including:

i.   A black AK-47 rifle with a folding stock;

ii.  A green AR-15 5.56 caliber semi-automatic pistol, with no serial number, with an attached scope;

iii. A green AR-15 semi-automatic rifle, with no serial number, with an attached scope;

iv.  A black AK-47 semi-automatic pistol;

v.   A loaded silver Keltec 9mm semi-automatic pistol;

vi.  A loaded black Browning Arms .22 caliber semi-automatic pistol;

vii. A loaded black Glock 27 .40 caliber semi-automatic pistol;

           viii.    Two black Bersa .380 caliber semi-automatic pistols, one of which was loaded;

           ix.  A black Sig Sauer 9 mm caliber semi-automatic pistol;

           x.  Two chrome Smith and Wesson .40 caliber semi-automatic pistols, one of which was loaded;

           xi.  A loaded black Ruger 5.7 mm semi-automatic pistol;

           xii. A loaded black High Standard .45 caliber semi-automatic pistol;

           xiii.    A loaded chrome Taurus .357 caliber revolver;

           xiv. A loaded black Mossberg 9mm semi-automatic pistol;

           xv.  A loaded black FN .45 caliber semi-automatic pistol; and

           xvi. Hundreds of rounds of ammunition of various calibers, which were located in numerous places in the Nissan Van, including loaded in multiple firearms, in plastic bags, in ammunition cannisters, and loosely strewn around the interior of the van.

        d.  LASD Detectives also found multiple firearm parts and accessories including a black Springfield handgun case, a black gun case containing a handgun holder, a black rifle stock attachment, and two black handgun magazines.

        e.  In the Nissan Van, LASD Detectives also found approximately 38.01 kilograms of suspected methamphetamine,

approximately 9.87 kilograms of suspected cocaine, approximately 921 grams of suspected fentanyl, approximately 291 grams of suspected heroin, approximately 67 grams of suspected crack cocaine, approximately 119 grams of suspected MDMA, approximately 297 grams of suspected Xanax, and approximately 1.05 kilograms of suspected marijuana.

     f.    LASD Detectives recovered some of the drugs described above in black plastic trash bags and a Cheez-It box that were similar in appearance to items Detective Lee saw GARCIA and HERNANDEZ load into the Nissan Van.

     g.    LASD also found SUBJECT DEVICES 2, 3, 4, and 5 in the Nissan Van, along with approximately $427 in cash.

    **E.    Search of Kinsie Residence Reveals Additional Guns, Ammunition, Suspected Drugs, and SUBJECT DEVICES 6-14**

    20.   Based on my conversations with Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

     a.    The Kinsie Residence is comprised of a front house, and a separate garage, converted to living quarters, in the rear.

     b.    Pursuant to the state search warrant, LASD Detectives Salcedo, Yzabal, and Mileski searched the Kinsie Residence.

     c.    In the converted garage, LASD Detectives found a California Department of Corrections Prisoner Identification Card in the name of GARCIA, as well as an expired California Identification Card in GARCIA's name.

d.   LASD Detectives found two guns, multiple rounds of ammunition in the converted garage, a suspected firearm silencer, and numerous magazines, including:

i.   A loaded grey and black FN FNS-40 .40 caliber semi-automatic handgun located in the nightstand next to the bed;

ii.   A loaded black Ruger .380 caliber semi-automatic handgun located on the floor of the converted garage at the foot of the bed;

iii. Three magazines for a semi-automatic handgun in the same nightstand;

iv.   A black plastic bag containing multiple rounds of ammunition, 12 semi-automatic handgun magazines, and 2 rifle magazines in a basket;

v.   A gray bag containing multiple rounds of ammunition, as well as several semi-automatic handgun magazines and rifle magazines;

vi.   Several rounds of ammunition in boxes on the top shelf of the closet; and

vii. A suspected black firearm silencer and a semi-automatic handgun magazine on top off a small table.

e.   LASD Detectives also found approximately 944 grams of suspected methamphetamine, approximately 328 grams of suspected cocaine, approximately 148 grams of suspected fentanyl, and approximately 15.72 kilograms of marijuana in the converted garage of the Kinsie Residence.

      f.   LASD Detectives found SUBJECT DEVICE 6 on the ground outside the rear door of the Kinsie Residence and SUBJECT DEVICES 7, 8, 9, 10, 11, 12, 13, and 14 inside the converted garage in a cloth basket on a shelf underneath the television.

**F.    Identification of Z.L. and Her Statements Regarding the Suspected Kidnapping**

21.  Based on my conversations with Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

      a.   At approximately 4:42 pm on April 26, 2023, Z.L. called the East Los Angeles Sheriff Station and said she was the woman in the video surveillance that GARCIA had hit.

      b.   Detectives Duff and Balderrama interviewed Z.L. at the East Los Angeles Sherriff Station.

22.  Based on my review of the audio recording of that interview, I know that Z.L. confirmed that she was the woman in the video surveillance.  Z.L. said that GARCIA was her boyfriend.  Z.L. had arrived at his house on April 25, 2023, and the two had gotten into an argument.  Z.L. then ran away from GARCIA and he followed her in his car.

23.  Z.L. claimed that she did not recall GARCIA being armed with a pistol when he struck her.  She said she was able to partially block the blow and sustained only pain and swelling to the upper portion of the right side of her head from the blow.

24.  Z.L. said that GARCIA dropped her off at her daughter's school shortly after she got into the vehicle.

**G.    A.B. Admits S/He Intended to Buy Drugs from GARCIA**

25.    Based on my conversations with LASD Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

        a.    At approximately 9:46 pm on April 26, 2023, Detectives Duff and Balderrama interviewed A.B. at the East Los Angeles Sherriff Station.

        b.    Detective Duff advised Barragan of his/her Miranda rights, and Barragan said s/he understood and agreed to waive those rights.

26.    Based on my review of the audio recording of Barragan's interview, A.B. initially claimed that s/he did not know GARCIA, had not been to his residence previously, and was at the Kinsie Residence to look for a truck to purchase.  A.B. then contradicted her/himself and said s/he had attended a party at the Kinsie Residence recently.

27.    A.B. ultimately admitted that s/he had gone to the Kinsie Residence to purchase cocaine from GARCIA but claimed s/he only purchases drugs from GARCIA for personal use.

**H.    GARCIA's Status as a Convicted Felon**

28.    On May 5, 2023, I reviewed certified conviction records for GARCIA and learned that GARCIA has previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year.  Specifically, on or about February 14, 2011, GARCIA was convicted of First-Degree Robbery, in violation of California Penal Code 211, in the Superior Court for the

17

State of California, County of Los Angeles, Case Number
BA376922.

29.  Based on my conversations with LASD Detectives Duff
and Balderrama and my review of booking photographs of GARCIA, I
am aware that GARCIA has two tattoos of handprints in black ink
on the front of his left and right shoulders.  He also has the
words "East LA" and "Whittier Boulevard" tattooed on his
stomach.  Based on my training and experience, I believe that
these tattoos indicate that GARCIA is associated with a criminal
street gang.

**I.  HERNADNEZ's Status as a Convicted Felon**

30.  On May 5, 2023, I reviewed certified conviction
records for HERNANDEZ and learned that HERNANDEZ has previously
been convicted of a felony crime punishable by a term of
imprisonment exceeding one year.  Specifically, on or about
October 14, 2014, HERNADNEZ was convicted of Possession of a
Controlled Substance for Sale, in violation of California Health
and Safety Code 11378, in the Superior Court of California,
County of Los Angeles, Case No. BA430165.

**J.  Interstate Nexus**

31.  On May 4, 2023, a Special Agent Ryan Cantanzano, an
ATF Interstate Nexus Expert examined the black Glock 27 .40
caliber semi-automatic pistol seized from the Nissan Van and the
black Ruger .380 caliber semi-automatic handgun seized from the
Kinsie Residence and determined that both were manufactured
outside of the State of California.  Thus, in order for these

18

firearms to be recovered in California, they had to have moved in interstate and/or foreign commerce.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

32.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus

may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

33.    From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

1.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

2.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[1] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

   c. The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

  3. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

4.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GARCIA's and HERNADNEZ's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of GARCIA's and HERNADNEZ's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

34.  For all of the reasons described above, there is probable cause to believe that GARCIA and HERNANDEZ have committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition.  There is also probable cause that the items to be seized described in Attachment B will

be found in a search of the SUBJECT DEVICES described in

Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 8th day of May
2023.

_____
HONORABLE CHARLES EICK
UNITED STATES MAGISTRATE JUDGE